J-S33013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROMAN ELON JONES | : | |
| | : | |
| Appellant | : | No. 618 WDA 2022 |

Appeal from the Judgment of Sentence Entered February 28, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0001550-2015

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, P.J.E.:                   **FILED: DECEMBER 12, 2023**

Appellant, Roman Elon Jones, appeals from the judgment of sentence of an aggregate term of 15-30 years' imprisonment, imposed following his convictions at a non-jury trial for third-degree murder, 18 Pa.C.S. § 2502(c); criminal conspiracy, 18 Pa.C.S. § 903; and firearms not to be carried without a license, 18 Pa.C.S. § 6106(a)(1).  We affirm.

The trial court sets forth the facts and procedural history of this matter in its Pa.R.A.P. 1925(a) opinion.  Trial Court Opinion ("TCO"), 10/18/22, at 1-10.[1]  On appeal, Appellant raises two issues for our review:

> I. Was the evidence … insufficient to prove third degree murder beyond a reasonable doubt insofar as the Commonwealth failed to establish that [Appellant] committed the murder where the

---

* Former Justice specially assigned to the Superior Court.

[1] We note that Julia Flesher was the decedent's, William Doyle, girlfriend and helped arrange the jitney ride on the night in question.  N.T., 11/15/21-11/22/21, at 48-50.

evidence shows that co-defendant[,] Jonathan Coles[,] was the shooter; and the testimony of the two Commonwealth witnesses who were present at the scene of the crime[] was unreliable?

II. Was the evidence insufficient to prove criminal conspiracy beyond a reasonable doubt where the Commonwealth failed to establish that [Appellant] agreed with Jonathan Coles[,] or such other person or persons[,] that they[,] or one or more of them[,] would engage in conduct which constitutes such crime or an attempt or solicitation to commit third degree murder?

Appellant's Brief at 5 (unnecessary capitalization and emphasis omitted).

It is well-established that,

[w]hen reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Steele***, 234 A.3d 840, 845 (Pa. Super. 2020) (cleaned up).

We have reviewed the comprehensive and sound opinion issued by the Honorable Randal B. Todd of the Court of Common Pleas of Allegheny County. We conclude that the reasoning set forth in Judge Todd's opinion ably addresses why the evidence was sufficient to sustain Appellant's convictions

for third-degree murder and criminal conspiracy.  **See** TCO at 10-16.[2]

Accordingly, we adopt his opinion as our own with respect to the issues

Appellant raises on appeal.[3, 4]

_____

[2] In Appellant's brief, he largely contests the credibility determinations of the trial court and how it weighed the evidence.  We agree with the Commonwealth that Appellant has waived such claims by failing to challenge the weight of the evidence below.  **See** Pa.R.Crim.P. 607(A) ("A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion."); **see also Commonwealth v. Johnson**, 180 A.3d 474, 478 (Pa. Super. 2018) ("Variances in testimony … go to the credibility of the witnesses and not the sufficiency of the evidence.") (citation omitted); **Commonwealth v. Melvin**, 103 A.3d 1, 43 (Pa. Super. 2014) ("An argument regarding the credibility of a witness's testimony 'goes to the weight of the evidence, not the sufficiency of the evidence.'") (citation omitted).

We also reject Appellant's argument that the evidence was insufficient because the witness testimony in the case *sub judice* was so inherently unreliable and contradictory that it renders the verdict a product of conjecture.  **See** Appellant's Brief at 22-23 (citing **Commonwealth v. Brown**, 52 A.3d 1139, 1156 n.18 (Pa. 2012)).  As the Commonwealth points out, Denise Fink and Jonathon Coles "both testified that [Mr.] Coles continued to shoot at the vehicle as [Mr.] Doyle took off running chased by [A]ppellant." Commonwealth's Brief at 26.  Further, "[t]he physical evidence supported the conclusion that there were two guns, a 9-milimeter that was used to fire at [Ms.] Flesher and [Ms.] Fink in the vehicle, and the .40 caliber gun which was used to kill [Mr.] Doyle."  **Id.**  Additionally, Ms. Flesher testified that both Appellant and Mr. Coles had a weapon.  N.T. at 80-81.

[3] With respect to Appellant's conviction for third-degree murder, we add to the trial court's analysis that Ms. Fink indicated that, when the shots started, Appellant took off running after Mr. Doyle.  **See** N.T. at 93, 97.  When Ms. Fink started her car to leave, she did not know where Mr. Doyle and Appellant were, but noted that Mr. Coles was still shooting at her car as she drove away. **Id.** at 94, 110.  In addition, Ms. Flesher testified that both Appellant and Mr. Coles had a weapon.  **Id.** at 80-81.  Finally, Mr. Coles testified that Appellant chased Mr. Doyle with the gun out.  **Id.** at 176.  Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the
*(Footnote Continued Next Page)*

_____

circumstantial evidence is sufficient to support that Appellant — not Mr. Coles — shot Mr. Doyle.

[4] Regarding Appellant's conviction for criminal conspiracy, he argues that "the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] shared criminal intent with [Mr.] Coles, or that an agreement existed between [Appellant] and [Mr.] Coles, to commit homicide." Appellant's Brief at 32; *see also id.* at 33, 34 (arguing that it was equally reasonable to infer that Appellant did not aid in or assist with the homicide of Mr. Doyle, and "had no idea that [Mr.] Coles planned to kill [Ms.] Fink, [Ms.] Flesher, and [Mr.] Doyle"). We add to the trial court's analysis of this issue that there was a text from Mr. Doyle to "Rome," sent at 11:25 p.m., shortly before the shooting on the night in question, that read "Bro, tell me what's wrong with her." N.T. at 147; *see also id.* at 49 (Ms. Flesher's referring to Appellant as "Rome" at trial); *id.* at 61-62 (Ms. Flesher's indicating that Mr. Doyle referred to Appellant as "Rome"). As Appellant himself observes, Mr. Doyle was apparently asking "Rome" what was wrong with either Ms. Flesher or Ms. Fink, which suggests that Mr. Doyle "had gotten wind that one of the two women was in trouble…." Appellant's Brief at 26. *See also id.* at 29 (acknowledging that Mr. Doyle was apparently present for Mr. Coles and Appellant's conversation about killing Ms. Fink). Further, as the Commonwealth notes, when the three men arrived back at Ms. Fink's vehicle, "rather than proceed with [Mr.] Coles to the driver's side of the vehicle where [Ms.] Fink was sitting, [A]ppellant stayed next to [Mr.] Doyle. When [Mr.] Doyle took off running, rather than let him leave, [A]ppellant chased after him and gunned him down." Commonwealth's Brief at 30. *See also* N.T. at 92-93, 106-08 (Ms. Fink's testifying that Mr. Doyle was on the passenger-side of the car, as was Appellant, when the shots started, and that Appellant ran after Mr. Doyle); *id.* at 161 (Mr. Coles's stating that "[Appellant] was … closer to the sidewalk, a little farther away standing there with [Mr.] Doyle before I started shooting[,]" and explaining that Appellant chased Mr. Doyle when Mr. Doyle ran away as Mr. Coles started shooting). Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we agree with the Commonwealth that:

> [E]vidence of a conspiracy often must be gleaned from the circumstances of the crime. In this case, we have more than just the circumstances, we have evidence of an actual discussion to kill [Ms.] Fink. The circumstances establish that this agreement also included the killing of any witnesses to the murder. Rather than fire his weapon at [Ms.] Fink, [A]ppellant ran after and fired

*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/12/2023

---

at [Mr.] Doyle.  Additionally, [A]ppellant was upset at [Mr.] Coles for not finishing the job.  Thus, the testimony established that the agreement between [Mr.] Coles and [Appellant] involved both the killing of [Ms.] Fink and the elimination of witnesses.

Commonwealth's Brief at 30-31.



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,

vs.

ROMAN E. JONES,

        Defendant.

CRIMINAL DIVISION

CC No. CP-02-0001550-2015

Appeal

**OPINION**

JUDGE RANDAL B. TODD

COPIES SENT TO:

Counsel of Record for the
Commonwealth of Pennsylvania

Stephen A. Zappala, Jr.
District Attorney

By

Michael W. Streily, Esquire
Assistant District Attorney
401 Courthouse
Pittsburgh, PA 15219

William E. Brennan, Esquire
Post-Conviction Counsel
PA No. 19684
310 Grant Street
Suite 1515 Grant Building
Pittsburgh, PA 15219

ALLEGHENY COUNTY, PA
CRIMINAL DIVISION
DEPT. OF COURT RECORDS

22 OCT 18 AM 11: 18

FILED

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF )   CRIMINAL DIVISION
PENNSYLVANIA, )
)
vs. )   CC No. CP-02-0001550-2015
)
ROMAN E. JONES, )
)
Defendant, )

TODD, J.

October 18, 2022

## OPINION

This is an appeal by Defendant, Roman E. Jones, from a judgment of sentence imposed

on February 22, 2022 after Defendant was found guilty following a non-jury trial of Third

Degree Murder (18 Pa.C.S. §2502(c)); Criminal Conspiracy (18 Pa.C.S. §903); and Firearms Not

to be Carried Without a License (18 Pa.C.S. §6106(a)(1)). Defendant was sentenced to 15 to 30

years imprisonment for Third Degree Murder, a concurrent term of 10 to 20 years imprisonment

for Criminal Conspiracy and a concurrent term of 3 ½ to 7 years imprisonment for Firearms Not

to be Carried Without a License. Defendant's Post Sentence Motions were denied by an order of

April 27, 2022 and appellate counsel was appointed. On May 20, 2022 Defendant filed a Notice

of Appeal. On September 13, 2022 Defendant filed a Concise Statement of Matters Complained

of on Appeal pursuant to Pa.R.A.P. 1925(b) that set forth the following:

"A. The evidence was insufficient to prove Third Degree Murder beyond a
reasonable doubt insofar as the Commonwealth failed to establish that Mr. Jones
shot and killed the victim, Billy Doyle, where his alleged co-conspirator testified
that the gun allegedly used in the shooting belonged to him, and that he never saw
Mr. Jones fire the gun, but admitted that he fired two shots in the direction of
Jones and Doyle; the testimony of one eyewitness, Julia Fletcher, was unreliable
insofar as the Commonwealth conceded that her version of the events (for
example, that Billy was shot in the leg) was at least partially inconsistent with the

1

physical evidence, her observations were made while she was under extreme duress, and her view of what was occurring was limited by the darkness and her location/line of sight; and another witness never saw Mr. Jones shoot Mr. Doyle; and finally, unlike Jonathan Coles, Mr. Jones had no motive to shoot Mr. Doyle.

B.    The evidence was insufficient to prove Criminal Conspiracy beyond a reasonable doubt where the Commonwealth failed to establish that Mr. Jones agreed with Jonathan Cols or such other person or persons that they or one or more of them would engage in conduct which constitutes such crime or an attempt or solicitation to commit Third Degree Murder. None of the witnesses testified as to seeing or hearing Jones and Coles agree or act in concert to harm Mr. Doyle; in fact, Mr. Coles testified that he initially believed that Jones and Doyle had conspired to harm him."

## BACKGROUND

This matter arises out of the shooting death of William Doyle on January 20, 2015. The Commonwealth alleged that Defendant, Roman Jones contacted Doyle to arrange for a jitney to drive Defendant and his co-defendant, Jonathan Coles, from Crawford Village in McKeesport to Clairton and back again. In exchange for arranging the jitney Doyle and Flesher, both of whom were drug addicts, would be given some heroin. Doyle contacted a jitney driver, Denise Fink, who picked up Doyle and Flesher near their home in Port Vue. The three then went to Pirl Street in Crawford Village where they picked up Defendant and Coles. Doyle and Flesher were apparently unaware that Fink was a potential witness in a separate murder case involving a friend of Coles and that a "bounty" was on Fink to prevent her from testifying in that case. After the group drove to Clairton they returned to Crawford Village and parked on Pirl Street adjacent to Building 4 where Defendant, Coles and Doyle exited the vehicle and went into a nearby apartment. Shortly thereafter Defendant, Coles and Doyle returned to the car. While Fink and Flesher were still in the car and Doyle was standing next to the passenger side of car, Coles walked to the front of the car and began shooting into the vehicle in attempt to kill Fink and Flesher. Both Fink and Flesher were hit by the gun fire, but Fink and Flesher were able to flee

2

the scene and drive to nearby McKeesport Hospital. Doyle, who was outside the car, began running and Defendant began chasing him as he ran from the scene. Doyle was later found fatally wounded adjacent to Building 61 in Crawford Village. Defendant and Coles were later arrested and charged with conspiracy and Doyle's murder. The Commonwealth contended that Coles and Defendant recognized Fink as the witness in the other murder case and conspired to kill her, Doyle and Flesher as potential witnesses. The Commonwealth contended that as Coles was shooting at the women in the car with his 9 millimeter handgun, Defendant chased down Doyle and shot him repeatedly with a .40 caliber handgun that had been given to him by Coles. While there was no dispute that Coles shot the women in the car, Defendant argued that the evidence showed that it was Coles who, after shooting the women in the car, chased down Doyle and shot him to eliminate him as a witness.

At trial the Commonwealth called Officer Joseph Stepansky who testified that on January 20, 2015 he received a call that two shooting victims had arrived at McKeesport hospital and while responding to that call he received another call regarding shots fired at Building 61 in Crawford Village. Officer Stepansky proceeded to the parking area at Building 61 and found the Doyle lying on the ground between two vehicles covered in blood. (T., p. 9) The nearby vehicles had bullet holes in them, the glass was broken and there was blood on both vehicles. While he was conscious, Doyle was unable to speak and he was transported to the hospital where he died of gunshot wounds to the chest. (T., pp. 9-10) Shortly after arriving at Building 61, Officer Stepansky received another call to respond to Building 48 on Pirl Street in Crawford

3

Village where he observed broken glass, shell casings and heroin packets on the ground. (T., p. 11) Both scenes were secured, and County police then responded for further investigation. [1]

The Commonwealth called Detective Anthony Perry of the Allegheny County Police who identified photographs of the Crawford Village complex (T., p. 18) He described the evidence found at Building 61 (Scene 1) as two vehicles in the parking area, a pickup truck and a car, with broken glass, "red-brown staining consistent with blood," two cell phones and casings scattered on the ground (T., p. 19) The photographs of the scene showed markers identifying twelve (12) .40 caliber spent shell casings. (T., p. 20) Examination of the vehicles found the truck had five bullet holes and a hole in the driver's window and the second vehicle had shattered front passenger window. The truck had blood on the driver's side of the vehicle and the car had blood on the passenger side of the vehicle as well as inside on the front passenger side. (T., p. 21)

Detective Perry also identified the two cell phones that were found at Scene 1, one of which was later identified as Doyle's phone that contained a contact for "Rome" (T., p. 26) Detective Perry then retrieved the 911 calls made that night regarding the shooting and Flesher was able to identify Doyle's voice as one of the calls. (T., pp. 31 -32) Detective Perry also testified to text messages between Doyle's phone and a contact "Rome" starting at 8:47 p.m. and 11:25 p.m. on the night of the shooting. (T., p. 149)

Detective Perry also testified that while on the scene he also went to Building 48 on Pirl Street, ("Scene 2") where he found broken glass on the road, eight (8) 9 millimeter shell casings,

---

[1] Throughout the testimony the scene at Building 61 where Doyle was found is referred to as "Scene 1." The area outside of Building 48 is referred to as "Scene 2." Although both buildings are part of the Crawford Village complex, they are separated by approximately a quarter mile and neither scene is visible from the other. (T., p. 35 )

4

a baseball cap, three stamp bags of heroin and two footprints in the snow on the nearby grass. (T., p. 27)

On cross examination, Detective Perry testified that the phone also had a contact for "Big B" (T., p. 34) He also testified that Scene 1 could not be viewed from Scene 2. (T., p. 35) He testified that on the night of the shooting there was some snow but only on the grass and not on the pavement or asphalt. (T., p. 35) He testified that he documented two footprints in the snow at Scene 2, simply because they were there, but could not identify any evidence that anyone had fallen in the grass or snow at Scene 2. (T., p. 38) He also testified that that there was no blood at Scene 2, there were no .40 caliber casings at Scene 2 and there was no blood trail between Scene 2 and Scene 1. (T., pp. 39- 41) He described the distance between Scene 2 and 1 as about a quarter mile and downhill , which he characterized as a "walkable" distance. (T., p. 43)

The Commonwealth called Julia Flesher, the victim's girlfriend. Flesher testified that she knew Doyle for seven years and that they regularly used drugs together. She testified that Doyle had agreed to arrange for a jitney for Defendant that night and in exchange Doyle and she would receive some heroin. (T. p. 49) Doyle contacted Fink to act as the jitney and Fink picked her and Doyle up near their home in Port Vue at approximately 10:30 p.m. and they drove to Pirl Street at Crawford Village where they picked up Defendant and Coles. (T., p. 51) Fink was driving, Flesher, Doyle and Defendant were in the back seat and Coles sat in the front seat. (T., p. 51) Fink then drove the group from Crawford to Clairton where Defendant got out of the car and entered an apartment. Shortly thereafter he returned, and Fink drove the group back to Pirl Street. (Scene 2) Flesher testified that she, Doyle and Fink were given bags of heroin and Fink was also given gas money. (T., p 55) Defendant, Coles and Doyle then went into one of the nearby buildings. Flesher testified that after about five minutes Defendant, Coles and Doyle

5

returned and that Defendant and Doyle were standing to the right of the car and Defendant "dabbed Billy up", which meant he shook his hand, and Defendant "then shot him." (T., p. 55) Flesher testified that Coles then went to the front left side of the car and began shooting into the car. (T., p. 55) She testified that when the shooting started Defendant and Doyle were on the right side of the car and Defendant had a gun in his hand and he shot Doyle in the leg and he fell to the ground. (T., p. 56) Flesher testified that she heard several shots and she was shot twice in the leg. She at first tried to get out of the car but then told Fink to drive and they drove down the hill to McKeesport Hospital. She testified that she identified Defendant from a photo array the following day as the person that shot Doyle. (T., p. 59) She also identified Doyle's voice on the 911 call. (T., p. 62)

On cross examination Flesher testified that she had a serious heroin addiction and was withdrawing that night. She testified that Coles and Defendant both started shooting at the same time. (T., p. 72) She testified that Doyle got shot in the leg and he fell to the ground and his hat came off. (T., p. 72) She couldn't state how many times that Defendant shot Doyle, but the last time she saw Doyle he was on the ground and she didn't see him run from the scene. (T., p. 74) Flesher also testified that she was unaware that Fink was a witness in another homicide case.

The Commonwealth also called Denise Fink. (T., p. 85) Fink testified she worked as jitney and that she knew Doyle for a couple years and he contacted her and asked her to "give his boys a ride" in exchange for some heroin. (T., p. 87) She picked up Doyle and Flesher in Port Vue and went to Crawford Village. Fink testified that she had previously testified in a homicide case and as a result she had "heard on the streets to stay out of there, you know, watch my back." (T., p. 89) When they arrived at Crawford Village she went to Pirl Street and Doyle got out of the car and several minutes later returned with Defendant and Coles (T., p. 89). They

6

all got into the car and she drove them to Clairton and then back to Crawford Village where she again parked on Pirl Street. (T., p. 91) Defendant, Coles and Doyle exited the vehicle and went into a nearby apartment and after approximately 15 minutes returned and as they were approaching the car Coles "came around my side and started shooting." (T., p. 93) She testified that Coles pulled the gun out of his pants and the shooting "never stopped." (T., p. 93) She testified that she was focused on Coles but Defendant and Doyle were on the other side of the car and that Doyle began running. (T. 93) She did not see Defendant with a gun. (T., p. 94) Fink testified that Flesher was in the back seat "screaming about Billy" saying "They are going to kill him" (T., p. 94) . She then started the car and fled the scene and drove to McKeesport Hospital. Fink testified that she was shot nine times in her legs and side and was in the hospital for two weeks. She later identified Defendant and Coles in photo arrays. (T., p. 96, 97).

On cross examination Fink testified that she was a witness at a preliminary hearing involving another homicide in which she had driven the defendant in that case to the location of the victim and that she later learned that because of her testimony, she had " a price on her head." (T., p. 101) As a result, there was an area of Crawford Village she would avoid but she would go to Pirl Street, a one-way street, "so nobody would see me." (T., p. 102) She acknowledged that on the night of the shooting Doyle gave her two bags of heroin that she used, but she wasn't high when Coles walked to her side of the car and started shooting. She testified that at that point Doyle was about to get into the passenger side and Defendant was on the right side of the car also. (T., p. 107) Fink testified that Flesher, who was in the back seat was screaming, "They are going to kill him." (T., p. 111)

The Commonwealth presented the testimony of Detective Kevin McCue who testified that examination of Fink's vehicle showed ballistic damage to the left side of the vehicle on the

7

driver and rear passenger side and blood stains in the vehicle. (T., p. 124) Trajectory rods used during the examination of the vehicle showed that the shooter was at the front and the driver's side of the car. (T., pp. 129 – 130) There was also blood on the driver's seat and the rear passenger seat.

The Commonwealth also offered into evidence videos from the Crawford Village camera system maintained by the Mckeesport Housing Authority for the time period from 11:45:58 to 11:47:5 from five different cameras. It was also stipulated that in 2015 the Crawford Village camera system had several blind spots and people would congregate in areas not covered by the cameras. (T., pp. 135-136) These videos depicted, in part, two individuals going from Scene 2 to Scene 1, which the Commonwealth submitted was Defendant chasing Doyle.

The Commonwealth also called the co-defendant, Jonathon Coles. Coles testified that he was also charged with homicide and attempted homicide and in exchange for his testimony was offered 15 to 30 years and 10 years probation. (T., p. 153) Coles testified that he knew Doyle from selling drugs on the street and that he knew Defendant since the early 2000's. (T., p. 154) He testified that he and Defendant knew Jason Webb who was charged with homicide and was in jail. He also knew that a jitney driver was supposed to testify against Webb and he had been shown a picture of the driver. (T., p. 155). He also learned that there was money being offered to prevent the driver from testifying. (T., p. 156) Coles knew she was a "older white lady driving a black car." (T., p. 156)

Coles testified that on the night of the murder, Jones asked him to go with him to a house in Clairton and that a ride had been set up through Doyle. (T., p. 157) He testified that they met on Pirl Street, went to Clairton and then returned to Crawford Village. When they returned, Cole, Jones and Doyle went into a "crack house" and he was going to get some crack cocaine for

8

Doyle for the ride. (T., p. 158) He testified that before going to Clairton "we recognized the jitney driver before we got in the car" and that Defendant had mouthed to him, "This is the lady." (T., p. 159) He testified that when they returned to Crawford Village that he and Defendant "had a conversation about stopping her from coming, and the only way we could stop her from coming was killing her." (T., p. 159) He testified that when they returned to Crawford Village and went into the crack house he got a 9 millimeter gun and he gave Jones a .40 caliber gun. (T., p. 160) He testified that when he returned to the car he went to the driver's side and started shooting into the car at the jitney driver. He testified he shot nine or ten times and that Jones was standing closer to the sidewalk near Doyle. When he started shooting, Doyle screamed "Oh, shit" and started running behind building 48 and Defendant started chasing him. (T., p. 161) Coles testified that after he finished shooting, he ran down Pirl Street to a friend's house and as he was knocking on the door he heard a "a lot of gunshots." (T., p. 162) He testified that three or four days later he talked with Jones who told him that "we shouldn't be talking" and was that Jones "was kind of upset that I didn't, you know, finish the job . . ." (T., p. 162)

On cross examination Coles acknowledged that he was testifying under a plea deal. He admitted that he was told prior to the shooting that he could get $15,000 to "make sure she [Fink] don't come to court" and that he got $7,500 for shooting her and that his intent was to kill her. (T., p. 168) He also admitted that both the 9 millimeter and the .40 caliber guns were his but also testified they he gave the gun to Defendant that was used to shoot Doyle. (T., p.172) He also testified that he never saw Defendant shoot at the car or at anybody that night, but he did see that Defendant "gave chase with the gun out." (T., p. 176) He denied chasing Doyle and testified that after he finished shooting he went to building 58 and then he heard the other shots. (T., p. 177) Coles also admitted that during earlier interviews with the police he lied several times,

9

including about how the shooting started, that he had seen Defendant shooting and that he had shot at Defendant. (T., p. 188-189)

The Commonwealth also called Raymond Everett of the Allegheny County Office Medical Examiner's Office as the manager of the firearm and tool mark section. Everett testified that the .40 caliber casings and the bullet and bullet fragments recovered from the victim's autopsy all came from the same firearm and the 9 millimeter cartridges all came from the same firearm. (T., pp. 205 -210)

The Commonwealth also called Dr. Todd Luckasevic of the Allegheny County Medical Examiner's Office who testified that as a result of the autopsy of the victim he found nine gunshot wounds which included a wound to the right mid-back, which caused a fatal injury to the lung. He also found wounds to the left shoulder, right upper arm, left upper arm, left hand, left thumb and left middle finger. (T., pp. 214 - 224) Dr. Luckasevic testified that Doyle died from a perforating gunshot wound to the chest. On cross examination Dr. Luckasevic testified there was no evidence that Doyle was shot in either leg. (T, p. 226)

**DISCUSSION**

In his Concise Statement, Defendant first contends argues that the evidence was insufficient to prove that he shot and killed the victim. Specifically Defendant points to evidence that indicates that co-defendant Coles committed the murder. Defendant also argues that the testimony of Flesher and Fink was inconsistent, unreliable and was also contradicted by forensic evidence presented by the Commonwealth.

When reviewing a sufficiency of the evidence claim the evidence must be viewed in the light most favorable to the Commonwealth, as verdict winner, to determine if there is sufficient

10

evidence to enable the factfinder to find every element of the crime charged beyond a reasonable doubt. *Commonwealth v. McNair*, 603 A.2d 1014 (1992). *Commonwealth v. Cropper*, 345 A.2d 645, 646 (1975) It is exclusively within the province of the factfinder to believe none, some or all of the evidence presented. *Commonwealth v. Henry*, 569 A.2d 929, 939 (1990); *Commonwealth v. Jackson*, 485 A.2d 1102 (1984). If the fact finder reasonably could have determined from the evidence presented that all of the necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict. *Commonwealth v. Wood*, 637 A.2d 1335, 1343 (1994) *Commonwealth v. Hopkins*, 747 A.2d 910, 914 (Pa. Super. Ct. 2000) In a bench trial, the credibility of the witnesses presented and the weight of their testimony will not be reversed absent a clear abuse of discretion or error of law. *Commonwealth v. Melvin*, 392 Pa. Super. 224, 572 A.2d 773 (1990).

Defendant first argues that the evidence established, through the testimony of co-defendant Coles, that the .40 caliber firearm used in killing Doyle belonged to Coles. Coles acknowledged on cross examination that he owned both the 9 millimeter that he used in shooting Fink and Flesher and the .40 caliber firearm. However, Coles also testified that when he and Defendant went into the crack house upon returning to Crawford Village and discussed killing the jitney driver, that he gave the .40 caliber to Defendant. The fact that the .40 caliber firearm belonged to Coles does not diminish the credible evidence that establishes that Defendant then used the gun to kill Doyle after he Doyle fled the scene and Defendant pursued him.

Defendant also argues that Coles testified that he never saw Defendant fire the gun. However, while Coles did not see Defendant fire the gun, he did testify that he gave the gun to Defendant and that when he saw Doyle flee the scene of the shooting on Pirl Street, he saw Defendant chasing him with the gun out. Coles also testified that after he fled the scene, he then

11

heard additional gun shots. This evidence combined with the evidence showing that Doyle fled the scene and was found fatally wounded near Building 61, with the .40 caliber casings on the ground nearby, is clear evidence that Defendant fired the fatal shots at Doyle.

Defendant also argues that Coles also testified that he fired two shots in the direction of Defendant and Doyle. However, Coles testified that the statements he made to detectives after being arrested about a month after the shooting, that he shot at Defendant and Doyle, were lies. (T., pp. 187 - 189) The record establishes that Defendant's counsel cross examined Coles extensively regarding his statements to the police that contained several false statements that were intended by Coles at that time to deflect the accusations that he purposely was shooting at the jitney driver to prevent her from testifying in another case. However, while the evidence established that Coles lied repeatedly to the police, the testimony of Flesher and Fink, as well as the physical evidence as discussed at length above, corroborates Coles' testimony that it was Defendant that pursued and shot Doyle.

Defendant also argues that the testimony of Flesher is inconsistent and contradicted by the physical evidence. Flesher testified that as the shooting began she saw Defendant with a gun and that he shot Doyle in the leg and he fell to the ground. However, the evidence from the autopsy showed that Doyle did not sustain a gunshot wound to either leg, there was no evidence of blood at the scene on Pirl Street (Scene 2), and there was no evidence of a blood trail between Pirl Street and the parking lot by Building 61 (Scene 2) where Doyle was found. In addition, there were no .40 caliber shell casings found at Scene 2. While this evidence indicates that Flesher's testimony that Doyle was shot in the leg is wrong, she testified that she saw Defendant with a gun as the shooting started. The evidence establishes that as Cole began shooting into the car in which Flesher and Fink was shooting, Flesher saw Doyle fall to the ground. If Flesher

12

mistakenly believed, with the beginning of the gun fire at her and Fink, that Doyle had been shot in the leg when he fell, this mistake in her testimony is reasonable in light of the overall circumstances. Flesher credibly testified that she saw Defendant with a gun. That her perception of the events would be impacted by the obvious chaos in which she found herself is understandable and does not undermine the overall credibility of her testimony that Defendant had a gun, which the other credible evidence establishes that he used as he pursued Doyle and shot him.

Defendant also argues that Flesher's testimony is not credible because she was under extreme duress, that her view of what occurred was limited by darkness and her location and line of sight. While each of these factors were present, it is also clear that Flesher had spent well over an hour with Defendant and co-defendant as they traveled from Crawford Village to Clairton and back. She observed them leave the vehicle on Pirl Street and return just before the shooting started. All of this testimony was corroborated by Fink. As discussed above, the fact there were some discrepancies in her testimony does not establish that the evidence when, taken as whole, was insufficient or lacked credibility.

Defendant also argues that Fink never saw Defendant shoot at Doyle. However the evidence establishes that as the shooting began, Cole was standing in front of her vehicle shooting into the vehicle, shattering the windshield, before walking to the driver's side and continuing to fire. It is entirely reasonable that, under the circumstances described by Fink, it is understandable she did not see what Defendant was or was not doing and does not undermine the other evidence establishing Defendant's actions in shooting Doyle.

Defendant also argues that, unlike Coles, Defendant did not have a motive to shoot Doyle. In fact, the evidence establishes that both Coles and Defendant had agreed that the Fink

13

would be killed to prevent her from testifying in another case. The evidence also establishes that Flesher and Doyle would have been witnesses to Fink's killing and they there was no hesitancy in eliminating them as witnesses also. Coles clearly indiscriminately fired into the Fink vehicle in which Flesher, Doyle's girlfriend, was a passenger. The evidence establishes that Defendant, in pursing and shooting Doyle, was motivated, like Coles, to eliminate any witnesses to the shootings that night in which Defendant participated.

Defendant next argues that the evidence was insufficient to prove criminal conspiracy where the Commonwealth failed to establish that Defendant agreed with Coles that they would engage in conduct to attempt or solicit third degree murder. In *Commonwealth v. Weimer*, 602 977 A.2d 1103, 1105-06 (2009) , the Court stated the following:

> Our Superior Court has dealt with various cases involving conspiracy and third degree murder. See Commonwealth v. Johnson, 719 A.2d 778, 785-86 (Pa. Super. 1998) (en banc) (defendant can be charged with conspiracy to commit third degree murder because death was natural and probable consequence of such attack, even if defendant did not personally participate in killing); Commonwealth v. La, 433 Pa. Super. 432, 640 A.2d 1336, 1345 (Pa. Super. 1994) (if killing is natural and probable consequence of co-conspirator's conduct, murder is not beyond scope of conspiracy); Commonwealth v. Bigelow, 416 Pa. Super. 449, 611 A.2d 301, 304 (Pa. Super. 1992) (defendant's participation in conspiracy supported third degree murder conviction as victim's death was natural and probable consequence of co-conspirator's conduct); see also Commonwealth v. Wanamaker, 298 Pa. Super. 283, 444 A.2d 1176, 1178 (Pa. Super. 1982) (defendant's conduct revealed conscious disregard of great risk of inflicting death or serious bodily harm upon victim -- manifested malice constituted criminal conspiracy to commit third degree murder); but see Commonwealth v. Clinger, 2003 PA Super 368, 833 A.2d 792, 795-96 (Pa. Super. 2003) (because it is impossible for one to intend to commit an unintentional act, it is impossible to commit crime of conspiracy to commit third degree murder). The flaw in appellant's argument is factual -- the jury found appellant guilty of conspiracy to commit criminal homicide, not conspiracy to commit third degree murder. See Criminal Conspiracy -- Criminal Homicide Verdict Slip, 4/7/06. Appellant was neither charged with nor convicted of conspiracy to commit any specific degree of murder, much less third degree murder -- as such, the issue for which we granted allowance of appeal can only be addressed by putting the proverbial rabbit in the hat, for it is

14

not made out by these facts. Whatever intellectual appeal the syllogism of the appellant's argument may have, it begs the question. One may certainly be convicted of conspiracy to commit homicide, and the jury's decision to convict of murder in the third degree does not render the preexisting conspiracy a nonentity. Put another way, the ultimate gradation of the crime accomplished does not in and of itself delimit the degree of crime originally planned -- the crime ultimately accomplished does not retroactively limit the scope of the original conspiracy. A jury's determination of the degree of homicide accomplished does not limit the conspiracy's scope. If appellant conspired to intentionally, knowingly, recklessly, or negligently cause the death of Haith, she may be found guilty regardless of which of those adverbs are found or not found by the jury. To sustain a criminal conspiracy conviction, the Commonwealth must establish a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903; 2 <u>Commonwealth v. Rios</u>, 546 Pa. 271, 684 A.2d 1025, 1030 (Pa. 1996) (citations omitted). The overt act need not accomplish the crime -- it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed.
*Commonwealth v. Weimer*, 977 A.2d 1103, 1105-06 (2009)

Defendant argues neither Fink nor Flesher testified to seeing or hearing Defendant or Coles agree or act in concert to harm Doyle. As noted above, Coles testified that when they first approached Fink's vehicle to be driven to Clairton, "we recognized the jitney driver before we got in the car" and that Defendant had mouthed to him, "This is the lady." (T., p. 159) He testified that when they returned to Crawford Village, that he and Defendant "had a conversation about stopping her from coming,[to testify] and the only way we could stop her from coming was killing her." (T., p. 159) Coles also testified that he then gave the .40 caliber gun to Defendant when they returned to Crawford Village.

Defendant also argues that Coles testified that he initially believed that Defendant and Doyle had conspired to harm him. A review of Coles' testimony establishes that this statement was, as noted above, part of the false statements that Coles made at the time of his arrest to explain his actions at the time, especially since both Fink and Flesher had survived the attack and identified him. Coles' statements were an attempt to explain his shooting at the scene that he

15

claimed was being done, essentially blindly, which he claimed was in response to some perceived attack by others, which could have been Defendant or Doyle. There is no evidence that either Doyle or Defendant shot at Coles.

The evidence also establishes that Flesher saw Defendant with a gun when Coles and Defendant returned to the car and as he stood near Doyle just as the shooting started. Further, Coles testified that days after the shooting that Defendant was upset because Fink and Flesher had survived and "the job" had not been finished. (T., p. 162) The totality of the credible evidence establishes that Defendant and Cole conspired to kill Fink, as well as Flesher and Doyle, as potential witnesses.

Based on all of the evidence, the Commonwealth presented substantial and credible direct and circumstantial evidence to prove beyond a reasonable doubt that Defendant is guilty of third degree murder, criminal conspiracy and the firearms violation.

By the Court:

_____ J.

16